

June 11, 2026

Kevin J. Nash, Esq.
Goldberg Weprin Finkel Goldstein LLP
125 Park Avenue, 12th Floor
New York, NY 10017

> Re:   Fordham Landing South
> 330-360 West Fordham Road
> Bronx, NY 10468
> Block 2312; Lots 264 & 265
> (the "Property")

To Whom it May Concern:

Subject to the terms and conditions hereinafter set forth in this Construction and Permanent Financing Commitment and Agreement, Parts I and II (this "Commitment"), Urban Builders Collaborative LLC ("UBC"), the development affiliate of Lettire Construction Corp. ("Lettire"), hereby agrees to fund and procure municipal and bank financing to complete the Fordham Landing South re-development project. As discussed below the project contemplates building almost 1,000 affordable housing units at the above referenced Property (the "Project"). Funding will be made and obtained subject to the conditions of this Commitment and the Approvals (as defined and set forth herein). The funds will be advanced through one or more mortgage loans (collectively, the "Loan") as delineated herein, beginning with acquisition funds of $75.2 million to acquire the Property as part of the exit strategy for DS Fordham Landing 1 LLC, Dynamic Star LLC and DS 1 GP Inc. (collectively, the "Debtors") to emerge from pending Chapter 11 cases pursuant to a joint plan of reorganization (the "Plan").

The cornerstone for the Plan is this Commitment as a means to satisfy the allowed claims of creditors on terms to be agreed or fixed by the Court. The claims primarily consist of the mortgage held by an affiliate of Igal Namdar and his mezzanine loan. Lettire and UBC have the experience and resources to fulfill this commitment in accordance with the terms hereof (please see Exhibit 1 for Lettire and UBC qualifications).

### Background

Founded in 1979 by brothers Nicholas and Gerard Lettire, Lettire Construction Corp. has grown into one of New York City's leading builders in the mixed-income, affordable and supportive housing sectors. With more than 45 years of experience and over 10,000 housing units, Lettire has built a reputation for executing complex projects and delivering high-quality housing in partnership with the City of NY, strengthening communities across the five boroughs.

Additionally, Urban Builders Collaborative, Lettire's development affiliate, has led the development of over twenty buildings totaling some 3,500 units in excess of $2.5 billion in development costs.  The Project's nonprofit partner, Bronxworks, opened its first office in 1972 and has been providing the Bronx community with comprehensive support services and resources for over 50 years, empowering generations of Bronx residents to make meaningful change in their lives. With close to 100 years of combined affordable housing and social services experience, the Development is position to successfully finance, build and manage the Project.

**Prior Funding**

UBC/Lettire have already spent approximately $8 million on the Project's predevelopment costs, including all taxes and insurance, and estimates an additional $7 to $10 million of additional expenses (Exhibit 2) prior to the financing closing, including all costs associated with administration of the Chapter 11 cases.  UBS and Lettire have not and will not seek reimbursement of these advances from the Debtors' estates during the bankruptcy cases.

The City of New York's Department of Housing Preservation and Development ("HPD") along with the New York City Housing Development Corporation ("HDC") typically issue bonds and subsidy capital at the end of the City's fiscal Year (June) and calendar Year (December). UBC/Lettire anticipates a financing closing December 31, 2026, and to proactively advance the project, Lettire has set a mobilization date after the July 4th holiday to start preliminary construction. The development team has pushed forward with permitting and expediting with several approval and permits with Foundation and New Building Permits forthcoming (See Exhibit 3).

Lettire and its principals have a combined Net Worth of $150 million and over $50 million of liquidity. Lettire is on its fourth Contractor Controlled Insurance Program ("CCIP") totaling over $2 billion in projects. Zurich has been a trusted surety for decades and recently provided a letter of bonding capacity for $750 million (See Exhibit 4). Lettire has the capacity and track record to provide additional guarantees to lenders in lieu of requiring the developer to purchase a project specific Payment & Performance Bond, saving 1% of overhead (Wells Fargo, Chase and Citibank have waived P&P Bonds on contracts over $100 million over the past 5 years.

The Loan will be secured by one or more first position construction and permanent mortgages (collectively, the "Mortgage") executed by the JV entity known as Fordham Landing South Partners LLC (the "Borrower") and Fordham Landing South Housing Development Company, INC. (the "HDFC", and together with the Borrower, the "Mortgagor") and evidenced by one or more mortgage notes executed by the Borrower (collectively, the "Note") and other documents executed by Borrower and/or the HDFC (the "Loan Documents"). These Notes and Mortgages will be executed in conjunction with a transfer of the Property free and clear of all claims, liens and interests pursuant to the Plan.  It is understood that at the Construction Loan Closing (defined below), the HDFC will be the fee owner of the Premises and the Borrower will

be the beneficial owner pursuant to a Nominee Agreement (hereinafter defined). The HDFC shall join in this Commitment, shall be a co-mortgagor under the Mortgage and a co-obligor under the Regulatory Agreement (as defined in Part II, Section 2 of this Commitment). Additionally, the HDFC must remain the fee owner of the Premises throughout the term of the Mortgage. During the construction of the Project, the Mortgage shall be subject to credit enhancement.

The New York City Housing Development Corporation ("HDC') bonds are anticipated as a stand-alone bond issuance with $127 million of new volume cap (which a portion will be paid down at permanent loan conversion) and $44.5 million of long term recycled bonds (see Exhibit 5). Bank of America will arrange a private construction loan of up to $150 million dollars (see Exhibit 6). The permanent mortgage is anticipated to be a 60-month unfunded forward commitment from Merchants Bank as an agency lender on behalf of Freddie Mac (see Exhibit 7).

The Low-Income Housing Tax Credit (LIHTC) Equity will be purchased for $0.89 per credit with an annual credit of $22.7 (see Exhibit 8). Approximately 25% of the LIHTC Equity will be contributed during construction to pay for a mix of acquisition, soft and hard costs, and developer fee with the remainder being paid at permanent loan conversion to pay down the short-term bonds, paid developer fee and the capitalized operating reserve. A deferred developer fee of approx. $35.91 million will be earned from project cash flows during the 15-year compliance period.

The project has been accepted into the New York State (NYS) Brownfield Program. The project is anticipated to generate approx. $48 million of NYS Brownfield Tax Credits. The credits will be purchased for $0.60 per credit. The Brownfield Tax Credit Equity is anticipated to pay down the short-term bonds at permanent loan conversion.

The New York State Empire State Development Corporation ("ESD") has committed $55 million to the project for infrastructure costs (see Exhibit 9). The $55 million is structured as a grant and will be funded to the project upon the completion of the slab on grade, as evidence by a controlled inspection report from a licensed engineer.

The project will receive $20 million of HDC subordinate capital. During construction, a simple interest rate set at the Applicable Federal Rate (AFR) with 1% Interest Paid plus a 0.25% servicing fee, with the difference deferred and accrued until maturity. Upon permanent loan conversion, 1% simple interest will be paid monthly.

The project will receive approx. $350 million of New York City Housing Department of Housing Preservation and Development ("HPD") subordinate capital. The Interest rate will be set at AFR monthly long-term rate in effect during the month of the construction loan closing. During construction, interest will be assessed at a simple rate; after permanent conversion interest will be assessed at a monthly compounding rate. All interest shall defer and accrue and be due as part of the balloon payment upon maturity of the loan. The Development Team will enter an HPD regulatory agreement for a minimum of 60 years.

This Commitment also contains ongoing obligations and financial undertakings as more specifically set forth herein of the borrower as well as Fordham Landing South Partners LLC, Nicholas Lettire, Gerard Lettire, Matthew Gross, and Urban Builders Collaborative, LLC, jointly and severally (collectively, the "Guarantor") regarding the Project, the Loan, the Subordinate Loans and the transactions contemplated by this Commitment, certain of which obligations shall continue for so long as this Commitment remains in effect.  Gary Segal and his partners will be engaged as Co-Developers and shall receive a percentage of the budgeted development fees as their return.

The Project shall comply with all of the provisions set forth in Article XII of the New York Private Housing Finance Law ("Act"), all requirements of HDC, all applicable New York City, State and federal laws, and the terms and conditions contained herein.

## 1.    **The Project**

A.    1.    The Project, as further described on Exhibit 10, is located at 330-360 West Fordham Road in the Bronx's University Hights Neighborhood (the "Premises"). The Project is to consist of the construction of four (4) towers across two main super structures. The southern superstructure consists of 354 units and one 33 story tower. The northern superstructure will include three towers, each 18 story's tall which total 573 units. The development will include 190 parking stalls and ~31,000 sqft of retail and community facility space. The dwelling units will include 361 studios, 307 one-bedrooms, 207 two-bedrooms, and 49 three-bedrooms. 253 units will serve formerly homeless individuals and families, while 100% of the units will be affordable. The Project will be subjected to a condominium regime after the Construction Loan Closing but prior to the Letter of Credit ("LOC") Release, as described in Section 2(B) below. The residential portions of the Project will be certified to Energy Star Standards and will also meet the Enterprise Green Communities sustainability criteria.

2.    The Borrower shall provide that nine hundred twenty seven (927) of the residential rental units in the Project (excluding two (2) superintendent's unit) shall be qualified low income units under Sections 42 and 142 of the Internal Revenue Code of 1986, as amended (the "Code") and the Project shall comply with the average income test under Section 42(g)(1)(C) of the Code. One hundred sixty two (162) of the units shall be rented to households whose annual household income does not exceed 27% of the New York City Area Median Income ("AMI") (the "27% Units"), one hundred eighteen  (118) of the units shall be rented to households whose annual household income does not exceed 47% of the New York City Area Median Income (the "47% Units"), thirty six (36) of the units shall be rented to households whose annual household income does not exceed 57% of AMI (the "57% Units"), three hundred fifty five (355) of the units shall be rented to households whose annual household income does not exceed 80% of AMI (the "80% Units"). Two hundred fifty three (253)  will be restricted to 60% of the median household income and

shall be reserved for formerly homeless individuals, as determined by The City of New York, (the "Homeless Units") and will receive rental assistance through the New York City Human Resource Administration's 15/15 Housing program pursuant to a project-based Rental Assistance Contract ("RAC") between Borrower and HPD. The initial rents shall be set as provided in the Regulatory Agreement. All income restrictions shall be set forth in a Regulatory Agreement to be entered into among HDC, HPD, the Borrower and the HDFC (the "Regulatory Agreement"). The Project will be operated as a rental housing project, subject to the marketing, use and occupancy restrictions contained in the Regulatory Agreement. Any present or future non-residential lease or occupancy agreement must be satisfactory to HDC in form and substance.

4.      Prior to LOC Release, the Project shall be subject to a condominium declaration and by-laws establishing a condominium (collectively the "Condominium") under Article 9-B of the New York Real Property Law (the "Condominium Documents"). The Condominium Documents shall establish three (3) separate condominium units, one unit shall be comprised of the 27% Units, 47% Units, the 57% Units, the 60% Units, and the community facility space (the "27-80% Condominium Unit"), the second unit shall be comprised of the 80% Units (the "80% Condominium Unit") and the third unit shall be comprised of the commercial space (the "Commercial Condominium Unit"; and collectively with the 27-60% Condominium Unit and 80% Condominium Unit, the "Condominium Units" or each a "Condominium Unit"). Each Condominium Unit will include its respective share of common elements in the Project. The Condominium Documents must provide, among other provisions that, subject to Section 339-cc of Article 9-B of the New York Real Property Law, the Mortgage and the Subordinate Mortgages shall control as to insurance, condemnation, and damage and restoration matters with respect to the Project, and as to any other matters requiring mortgagee consent. The receipt of a "No Action Letter" with respect to the Condominium from the office of the Attorney General of the State of New York and the recordation and effectiveness of the Condominium Declaration shall be a condition for LOC Release. Upon formation of the Condominium the equitable and beneficial interest in all the Units shall be owned by the Borrower and nominal fee title shall be owned by the HDFC. The Commercial Unit shall be master leased at Construction Loan Closing by the Borrower to Chestnut Commons Retail Tenant LLC (the "Commercial Master Lease") and the portion of the 27-60% Condominium Unit which comprises the community facility space (the "Community Facility Space") shall be master leased at Construction Loan Closing by the Borrower to Fordham Landing South CF Tenant LLC (the "Community Facility Master Lease") and subleased in its entirety by Fordham Landing South CF Tenant LLC, as landlord, to BronxWorks, Inc a New York not for profit. BronxWorks shall further sublease that portion of the Community Facility Space not allocated to BronxWorks use for its own operations, to subtenants, which, at this time are contemplated to use the space for social and

community services, counseling, job training, educational and theater/arts performance purposes.

B.    1.    The Project will be constructed on a parcel of the land that is presently owned by the DS Fordham Landing I LLC. The land will be conveyed to the HDFC, as nominee for the Borrower, at the Construction Loan Closing, pursuant to the confirmed plan for an amount sufficient to pay allowed creditor claims as agreed or fixed by the Court. The terms and conditions of, and all instruments and documents relating to, the transfer of title (including all conditions, restrictions and encumbrances set forth in such documents) shall be subject to the prior approval of HDC and the Construction Servicer, including, without limitation, all the following documents executed by HPD and Borrower and/or the HDFC: the deed, the land disposition agreement (the "Land Disposition Agreement"), the enforcement note (the "Enforcement Note"), the enforcement mortgage (the "Enforcement Mortgage"; all of the foregoing, collectively, the "Land Disposition Documents"). The terms and conditions of the Land Disposition Documents must be subordinated to the Mortgage and the Subordinate Mortgages pursuant to one or more subordination agreements acceptable to HDC and the Construction Servicer.

2.    Record fee title to the Premises will be held by the HDFC, which shall have entered into a Declaration of Interest and Nominee Agreement with the HDFC granting all beneficial interests in the Premises to the Borrower. The Nominee Agreement shall provide, in part, that if an Event of Default shall occur under the Loan Documents or the Regulatory Agreement, the HDFC shall have the right to cure the default as an agent for and on behalf of the Borrower, provided that the Borrower is not diligently acting to cure such default. As noted above, the HDFC shall mortgage its record fee interest in the Project by entering into the Mortgage, the Additional Mortgage and HDC Third Mortgage and the HDC Fourth Mortgage as co-mortgagor with the Borrower. The HDFC must also execute the Regulatory Agreement and certain other Loan Documents and Subordinate Loan Documents and the HDFC shall sign this Commitment to confirm its agreement to do so.

C.    Prior to the issuance of the Bonds, the Borrower, the Borrower's architect and the Borrower's accountant shall supply to HDC's bond counsel the information required by Bond Counsel in the Developer's Tax Certification (which the Borrower hereby confirms it has received from HDC). This information must indicate that at least ninety-five percent (95%) of the proceeds of the Allocable Bonds, including proceeds used to fund the Loan and the Additional Loan, if applicable, are expected to be used to pay qualified costs ("Qualified Costs") as set forth in the Developer's Tax Certification. Prior to the issuance of the Bonds, the Borrower shall provide to HDC and Bond Counsel all information and documentation satisfactory to HDC and Bond Counsel necessary to establish and support a Bond Counsel opinion that interest on the Allocable Bonds is not included in gross income for federal income tax purposes.

D.      The Borrower expects to obtain an exemption from real estate taxes for the portion of the Project which shall become the 27-60% Condominium Unit and the 80% Condominium Unit in accordance with Section 420-c of the Real Property Tax Law of the State of New York, as may be amended, for not less than 60 years. An opinion of counsel as to eligibility for such exemptions hall be a condition of the Construction Loan Closing. Any declaration made in connection with the 420-c benefits must be satisfactory to HDC in its sole discretion. Borrower also expects to obtain a partial tax abatement from real estate taxes for the Commercial Unit under the New York State Industrial and Commercial Abatement Program ("ICAP"), as may be amended, for not less than 25 years. The Borrower expects to receive an allocation of federal Low-Income Housing Tax Credits for the Project from HPD.

E.      The plans and specifications for the Project ("Plans and Specifications") and trade payment breakdowns shall be approved by Bank of America, N.A. ("Bank" or "Construction Servicer"), which is the financial institution expected to service the Loan and the Subordinate Loans during construction.

F.      Additionally, the Debtors expect that the Property will be transferred in accordance with this Commitment and under the confirmed Plan so as to qualify for transfer tax exemptions under 11 U.S.C. Section 1146(a).

**2.      The Borrower, the HDFC and the Managing Agent**

A.      1. (a)   The Borrower represents that it will be a single purpose New York limited liability company, formed for the purpose of acquiring, constructing, equipping, leasing and owning the Project. The members of the Borrower are Fordham Landing South Managers LLC, a New York limited liability company (managing member; 0.01% interest) (the "Managing Member"), Bank of America, N.A., a national banking association, (non-managing member; 99.99% interest) (the "Investor Member") and Banc of America CDC Special Holding Company, Inc., a North Carolina corporation (non-managing member; 0.0% interest) (the "Special Member" and together with Investor Member, the "Tax Credit Investor"). The members of Managing Member are UBC Fordham Landing LLC, a New York limited liability company (managing member; 50% interest) and the HDFC (member; 50% interest). UBC Fordham Landing members are Nicholas Lettire (managing member; 37.5% interest), Gerard Lettire (member; 37.5% interest) and Matthew Gross (member; 25% interest).

(b). The HDFC represents that it will be a New York not-for-profit corporation formed pursuant to Article XI of the Private Housing Finance Law composed of BronxWorks, Inc.

(c) Urban Builders Collaborative LLC, a Delaware limited liability company which is composed of Nicholas Lettire (managing member; 50% interest), Gerard Lettire (member; 50% interest).

(d). Fordham Landing Commercial Facility Master Tenant LLC, the tenant under the Commercial Master Lease will be a single purpose New York limited liability company whose sole member is Fordham Landing South Partners LLC and Fordham Landing Community Facility Master Tenant LLC, the tenant under the Community Facility Master Lease is a single purpose New York limited liability company whose sole member is Fordham Landing South Partners LLC.

2.      Prior to Construction Loan Closing, (a) each of the Borrower, and the HDFC, (b) each of the members or shareholders of the Borrower and the HDFC (except any member or shareholder that has no control over management or operations and whose principal role, as determined by HDC, is to make a monetary investment), (c) any changes in the Borrower or the HDFC, or in the members or shareholders of either, and (d) any persons or entities related to any of the foregoing as determined by HDC, shall be subject to the prior approval of HDC. All reporting entities or individuals shall provide all information required by HDC in connection with its review of their qualifications. Upon execution of this Commitment, the Borrower shall complete and return to HDC the Borrower's Contact Information.

B.      The managing agent and the management contract for the Project shall also be approved by HDC in its sole and absolute discretion prior and as a condition to the LOC Release (as defined in Section 3(B)(2) hereof), notwithstanding whether HDC has given its approval of the managing agent or the management contract at an earlier date, in connection with the Construction Loan Closing or otherwise. Borrower has advised HDC that Borrower expects to retain Eastside Management, Inc. ("Eastside"), as managing agent of the Project to perform certain services, each as set forth in the management agreement to be executed at Construction Loan Closing. If the Project is to be managed by Borrower or a related entity, then it must provide a management plan satisfactory to HDC. During the term of the Regulatory Agreement, HDC shall have the option to cause the Borrower to terminate the management contract and cause Borrower to remove the existing managing agent in accordance with the applicable provisions of the Regulatory Agreement. The management contract shall be collaterally assigned to the Construction Servicer at the Construction Loan Closing and will continue to run to HDC after the LOC Release for the duration of the Permanent Loan (as defined in Section 3(C)).

**3.      The Loan, the LOC, Construction Financing and the Subordinate Loans**

A.      The construction of the Project will be partially financed by the Loan. The principal amount of the Loan shall not exceed **SEVENTY MILLION EIGHT HUNDRED NINETY THOUSAND AND 00/100 DOLLARS ($171,500,000)**. Prior to the making of the

Mandatory Prepayment (defined in Section 3(C) hereof) or as otherwise provided in the Note, the interest rate on the Loan shall be (i) at a fixed rate of **3.60%** per annum on the portion of the Loan funded with a portion of the Allocable Bonds and with Corporate Funds (the "Short Term Portion") that when fully advanced will be equal to the Mandatory Prepayment and (ii) at a fixed rate of **6.60%** per annum on the portion of the Loan funded from a portion of Allocable Bonds (the "Long Term Portion") that when fully advanced will be equal to the Permanent Loan, which rates shall include the regularly scheduled portion of the Trustee's fees (as set forth in Section 6(C) hereof). The Long-Term Portion is anticipated to be **$104,860,000**, and the Short-Term Portion is anticipated to be **$66,640,000**. The interest rate on the Permanent Loan shall 6.60**%** per annum (inclusive of HDC's servicing fee and the mortgage insurance premium).

B.    1.    As a condition to the issuance of the Bonds, the Borrower shall be required to obtain a standby letter of credit in an amount equal to the stated principal amount of the Loan plus sixty (60) days of interest at the rate of 6.60% per annum, with a term of at least thirty-six (36) months from Construction Loan Closing, plus one six-month extension option (the "Scheduled Construction Period"), such letter of credit to be in form and content and from a provider satisfactory to HDC (the "LOC"). The Borrower shall have entered into a Commitment satisfactory to HDC with the Construction Servicer to provide the LOC prior to the issuance of the Bonds and shall furnish HDC with a copy of the LOC Commitment. The terms of the LOC Commitment shall be incorporated herein by reference and a default (beyond any applicable notice and cure period) under such LOC Commitment or any of the other LOC documents shall be a default under this Commitment. The making of the Loan and the Subordinate Loans is subject to Borrower's compliance with the LOC Commitment and all terms and conditions required by the Construction Servicer. In addition, the making of the Loan and the Subordinate Loans is conditioned upon HDC, the Borrower and the Construction Servicer entering into a mutually acceptable Servicing and Release Agreement (the "Servicing and Release Agreement") regarding the servicing of the Loan, the Subordinate Loans and the release of the LOC.

2.    The LOC shall secure HDC in the event of a default by the Borrower under the Note or the Mortgage until (i) the construction of the Project is completed and the conditions of this Commitment (including, without limitation, the conditions set forth in Section 11 hereof) are satisfied and (ii) certain other conditions set forth in the Servicing and Release Agreement are satisfied (the "LOC Release"). The LOC shall be returned to the Construction Servicer on the effective date of the LOC Release, and thereafter the Construction Servicer shall no longer service the Loan and/or the Subordinate Loans. If the LOC Release has not occurred on or prior to the expiration of the Scheduled Construction Period, as the same may be extended with the consent of HDC and as provided for in the reimbursement agreement to be entered into between the Borrower and the Construction Servicer (the "Reimbursement Agreement"), then the failure to satisfy the conditions for

9

the LOC Release shall be a default under this Commitment, the Loan and the Subordinate Loans, unless the Scheduled Construction Period is then extended by HDC in its sole discretion. The Construction Servicer, by issuing the LOC, will be assuming all customary lending risks associated with making a loan during construction.

3.       At the Construction Loan Closing, Lettire Construction Corp., an affiliate of Urban Builders Collaborative, LLC, shall enter into a completion guaranty for the benefit of the Construction Servicer (the "Completion Guaranty") with respect to the completion of the Project. The Completion Guaranty must run to HDC as a third-party beneficiary in the event of a wrongful dishonor of the LOC and be acceptable in form and substance to HDC.

C.       The Additional Loan shall consist of a second-priority mortgage loan in the principal amount of **TWENTY MILLION AND 00/100 DOLLARS ($20,000,000)**, all of which will be advanced during construction. The forms of the Additional Mortgage and the Additional Note that secure and evidence the Additional Loan shall be provided by and/or be acceptable to HDC. Prior to the date of the LOC Release, the Additional Loan will bear interest at a fixed rate of the long-term monthly Applicable Federal Rate published by the IRS for October 2026 (the "AFR") plus 0.25% per annum for the servicing fee imposed by the Construction Servicer. Interest-only payments shall be due on advanced funds only at the rate of 1.25% per annum (inclusive of the Construction Servicer's servicing fee) prior to the LOC Release, with the balance of the interest (1.07% per annum) deferred and accruing as simple interest until LOC Release. On and after the date of the LOC Release, the Additional Loan will bear interest at a fixed rate of the AFR per annum, with monthly interest-only payments due at a rate of 1.00% per annum on the face amount of the Additional Loan and the balance of the interest deferred and compounded monthly until maturity. At maturity, the accrued interest from the construction period and the principal amount of the Additional Loan and any unpaid interest will be payable in a balloon. The Additional Loan shall be coterminous with the Loan; in addition, the Additional Loan shall be due in full if the Loan is prepaid, in whole or in part (except for the Mandatory Prepayment), or otherwise become due prior to its maturity date. The Additional Loan may be prepaid, in whole or in part, at any time after the LOC Release, without premium, provided that the HDC Third Loan and the HDC Fourth Loan shall have been fully prepaid. A late charge of 4% of the amount due shall be charged on any payment of principal and/or interest due on the Additional Loan that is received fifteen (15) or more days after the date the payment is due. The Additional Loan shall not be made unless the Loan, the HDC Third Loan and the HDC Fourth Loan are made; and the Loan, the Additional Loan, the HDC Third Loan and the HDC Fourth Loan shall be cross-defaulted.

D.       The HDC Third Loan shall be a third-priority mortgage loan in the amount of  **THREE HUNDRED AND FIFTY MILLION SIX HUNDRED AND TEN THOUSAND TWO HUNDRED AND NINETY THREE ($350,610,293)** shall be advanced during construction. Prior to the date of the LOC Release, the HDC Third Loan will bear interest

at a fixed rate of the AFR plus a 0.25% per annum servicing fee imposed by the Construction Servicer. Prior to the LOC Release, interest-only payments shall be due on advanced funds only at the rate of 0.25% per annum (inclusive of the Construction Servicer's servicing fee) with the balance of the interest deferred and accruing as simple interest until LOC Release. On and after the date of the LOC Release, the HDC Third Loan will bear interest at a fixed rate of the AFR, with 0.0% paid and all interest fully deferred, accruing and compounding monthly until maturity. At maturity, the accrued interest from the construction period and the principal amount of the HDC Third Loan (including all accrued interest from the permanent period) will be payable in a balloon. The HDC Third Loan shall have the same term as the Loan and shall be due in full if the Loan is prepaid, in whole or in part (except for the Mandatory Prepayment), or such earlier date on which the entire principal becomes payable or otherwise due prior to its maturity date, as provided in the Third Loan Documents. The HDC Third Loan may be prepaid, in whole or in part, at any time after the LOC Release, without premium, provided that the HDC Fourth Loan shall have been fully prepaid. The note evidencing the HDC Third Loan sets forth the requirements for repayment upon a "Resale Transfer or a Refinancing", as such terms are to be defined in such note. The HDC Third Loan shall not be made unless the Loan is made; and the Loan, the Additional Loan, the HDC Third Loan and the HDC Fourth Loan shall be cross-defaulted. The execution and delivery of a satisfactory Grant Agreement with HPD, and HPD's agreement to provide the full amount of the funds for the HDC Third Loan contemporaneously with Construction Loan Closing, shall be conditions of Construction Loan Closing. Additionally, the Borrower understands that the HDC Third Loan will be advanced only to the extent the grant funds are received from HPD pursuant to the Grant Agreement.

E.     The Closing of the Loan, the Subordinate Loans and the delivery of the LOC must occur simultaneously ("Construction Loan Closing"). The forms of the Note, the Mortgage, the Loan Documents, and the documents relating to the Subordinate Loans provided or executed at Construction Loan Closing shall comply with all requirements of the LOC Commitment, this Commitment and the Servicing and Release Agreement, as applicable, and shall be satisfactory to HDC in its sole discretion. On and after the Construction Loan Closing, the trustee for the Bonds ("Trustee") shall hold the proceeds of the Bond-Funded Portion of the Loan and the Additional Loan in a subaccount of the Bond Proceeds Account established under the Resolution, and shall hold Corporate Funds received from time to time from HDC to fund the Corporate-Funded Portion of the Loan in a separate subaccount of the Bond Proceeds Account and all such amounts shall be disbursed pursuant to the direction of the Construction Servicer in accordance with the Servicing and Release Agreement. The Borrower and HDC agree that the Allocable Bond proceeds will be advanced pursuant to the project cost statement and will not be used for costs related to the commercial space.

F.      No financing encumbering the Project other than the Loan, the Permanent Loan and the Subordinate Loans shall be allowed at any time following the Construction Loan Closing, without the prior written consent of HDC. All documents relating to any deferred developer fee shall be subject to review and approval by HDC.

G.      Any and all master leases and occupancy leases for non-residential space (including, without limitation, any lease, sublease or occupancy agreement for commercial space and/or any part of community facility space) as well as any modification or replacement thereof, must be satisfactory to HDC in form and substance. Any lease of commercial space shall comply with all provisions of the ENYRPPP, all as more particularly set forth herein and in the Regulatory Agreement.

H.      Borrower must submit an independent appraisal acceptable to HDC setting forth the "as stabilized" value of the Project and the value of the Project predicated upon the completion and stabilization of the proposed improvements, which latter value must not be less than the Minimum Appraisal Amount.

I.      HDC may require that a sign be erected in public view on the Premises, during construction, indicating HDC's and HPD's provision of financing. HDC will provide a sign which shall be erected by Borrower, at its expense, within five (5) days of delivery.

J.      A late charge of 4% of the amount due shall be charged on any payment of principal and/or interest due under the Note and the Mortgage that is received more than fifteen (15) days after such payment is due; however, prior to the LOC Release, any late charge shall be established by the Construction Servicer.

K.      Any increase in the amount of the Loan and/or the Subordinate Loans prior to or after Construction Loan Closing shall be at the sole and absolute discretion of HDC and upon such terms, conditions and interest rates as HDC may require, including payment by the Borrower to HDC of the Costs of Issuance (as defined in Section 6 hereof) of any additional bonds necessary to fund the increase in the Loan. In addition, any increase in the Loan shall be accompanied by a corresponding increase in the amount of the LOC or provision of a replacement for the LOC satisfactory to HDC and in an amount equal to the Loan as increased.

L.      Prior to the Construction Loan Closing, Borrower shall have received a signed and sealed letter from an architect that the Project's design complies with the identified noise attenuation and air quality requirements set forth in the Statement of Findings issued by HPD and HDC's obligation to fund the Loan and the Subordinate Loans shall be specifically conditioned upon issuance of the Decision Document.

M.    Borrower must provide a furnishing plan for the Homeless Units prior to initial rent-up of the Project and must furnish each of the Homeless Units prior to initial rent-up of such unit, such plan and furnishings shall be subject to the prior written approval of HPD.

**4.    Terms and Conditions of Permanent Loan Subsequent to LOC Release**

A.    The term of the Note and Mortgage shall extend to 35 years from the date which is the earlier of the LOC Release date or the end of the Scheduled Construction Period, but in no event later than October 31, 2066. From and after the LOC Release date, the Loan shall also be referred to as the "Permanent Loan." The Permanent Loan shall be in the amount of **ONE HUNDRED AND FOUR MILLION EIGHT HUNDRED AND SIXTY THOUSAND AND 00/100 DOLLARS ($104,860,000)** and shall bear interest at the rate of **6.60%** per annum, which rate shall include HDC's servicing fee (as set forth in Section 6(B) hereof), mortgage insurance premium, if any, and the regularly scheduled portion of Trustee's fee (as set forth in Section 6(C) hereof). The Permanent Loan shall fully amortize over a 35-year term in accordance with the Loan Payment Schedule. Amortization payments shall commence on the first day of the first month which is at least one full month subsequent to the end of the Scheduled Construction Period, provided, however, that if the LOC Release occurs prior to such date, monthly payments of principal shall commence on the first day of the first month which is at least one full month subsequent to the LOC Release. If the LOC Release has not occurred on or before the expiration of the Scheduled Construction Period, and HDC has agreed to an extension and/or the waiver of a default under the Loan, the Subordinate Loans and this Commitment, then the Borrower shall be required, in respect of the period from the expiration of the Scheduled Construction Period until the day preceding the LOC Release, to make payments (i) of principal commencing on the first day of the first month subsequent to the expiration of the Scheduled Construction Period in an amount equal to the scheduled principal that would be paid if the Loan were fully advanced (as set forth in an amortization schedule to be provided by HDC) and (ii) of interest on the Loan based upon the outstanding principal balance of the Loan, which interest shall be computed at the rate of 6.11% per annum until the date of the LOC Release.

B.    1.    The Borrower and the HDFC shall provide estoppel certificates and legal opinions and other documents satisfactory to and as may be required by HDC in order to fulfill the conditions for the release of the LOC to the Construction Servicer. HDC may require modification of the Mortgage, the Note, the Additional Mortgage, the Additional Note, the HDC Third Loan Mortgage, the HDC Third Loan Note, the HDC Fourth Loan Mortgage, the HDC Fourth Loan Note and other Loan Documents on the date of the LOC Release. HDC shall also have the right to consolidate the Permanent Loan, the Additional Loan, HDC Third Loan and/or HDC Fourth Loan on or after the LOC Release.

13

2.      At or prior to the LOC Release date, Borrower shall cause the title company to deliver an endorsement to each of the title policies insuring the Loan, the Additional Loan, the HDC Third Loan and the HDC Fourth Loan that accomplishes the following: (i) adds REMIC, as applicable and if not already so named, if requested, as an additional insured to the title insurance policy (as its interest may appear); (ii) deletes the pending disbursements clause; (iii) reads the as-built survey into the title insurance policy; (iv) re-dates the date of the policy to the LOC Release date; (v) updates the Land Same as Survey Endorsement to refer to the as-built survey; (vi) adds a condominium endorsement; and (vii) substitutes the condominium description. In order to comply with this requirement and the Title Insurance Rate Service Association (TIRSA) manual, Borrower agrees that a holdback in the amount of at least $200 for each insured mortgage securing the Loan, the Additional Loan, HDC Third Loan and the HDC Fourth Loan will be withheld from proceeds of the title insurance line item in the construction budget until the LOC Release Date. This holdback will be advanced on the LOC Release Date and will be applied towards the cost of obtaining endorsements (i) through (vii) above. Borrower further understands and agrees that it may be required to deliver any other endorsement required by HDC to insure the Mortgage, the Additional Mortgage, the HDC Third Mortgage and the HDC Fourth Mortgage and such endorsement(s) must also be satisfactory to REMIC, if applicable.

C.      1.      The Borrower is required, and permitted, to make the Mandatory Prepayment within the time period and in the amount described in Section 3(C) above.

2.      Prepayment of the Loan, except for the Mandatory Prepayment, shall not be permitted until ten years from the LOC Release date. On or after the tenth anniversary of the LOC Release date, the Permanent Loan may be prepaid, in whole or in part, and the Borrower shall be required to pay a premium of 2% of the amount being prepaid until the day prior to the eleventh anniversary of the LOC Release; on or after the eleventh anniversary of the LOC Release, the Permanent Loan may be prepaid, in whole or in part, and the Borrower shall be required to pay a premium of 1% of the amount being prepaid until the day prior to the twelfth anniversary of the LOC Release. Commencing on the twelfth anniversary of the LOC Release, the Permanent Loan may be prepaid, in whole or in part, without premium. No prepayments of the Permanent Loan, other than the Mandatory Prepayment, may be permitted, however, until the Additional Loan has been paid in full and the HDC Third Loan and the HDC Fourth Loan have been prepaid (inclusive of any related fees payable to HDC) to the extent provided in the Third Loan Documents and Fourth Loan Documents, respectively. The Borrower shall provide HDC with at least thirty (30) days written notice of any intended prepayments. The Borrower shall be required to pay any premiums, and all costs and expenses associated with the redemption of the Allocable Bonds that would result from a prepayment of the Permanent Loan and the Additional Loan including, but not limited to, accrued interest on the

Allocable Bonds from the date of such prepayment to the date of redemption of the Allocable Bonds. Prepayments of principal must be made in full multiples of $10,000.

3.      To compensate HDC for continued monitoring of the Project for compliance with the Regulatory Agreement after a prepayment in full of the Loan, upon such prepayment and on an annual basis thereafter the Borrower shall be required to pay to HDC for the remaining term of the Regulatory Agreement an amount equal to $50 per residential rental unit for each of the Units, subject to an annual cap of $17,500, such amount to be increased annually in accordance with any increase in the New York City Consumer Price Index. In the event that the Borrower transfers its interest in the Project pursuant to the terms of the Regulatory Agreement, HDC reserves the right, in its sole discretion, to charge a one-time monitoring fee or revise the annual fee for continued monitoring.

4.      If the Project is not in compliance with the Regulatory Agreement on the date that a request for prepayment is made to HDC, then unless the Borrower withdraws the notice until the Project is in compliance, Borrower shall be required to enter into a Compliance Escrow Agreement with HDC providing that, in addition to the payment required by paragraph 3 above, Borrower shall, with respect to the Project, deposit an amount that is equal to $20,000 (the "Compliance Escrow"), such amount to be increased in accordance with any increase in the New York City Consumer Price Index. The Compliance Escrow shall be in addition to the monitoring fee required by Section 4(C)(3) above. The Compliance Escrow shall be applied ratably by HDC to monitor compliance with the Regulatory Agreement; once the Project is restored to compliance, any balance of the Compliance Escrow will be refunded to Borrower, without interest.

5.      To compensate HDC for continued Low Income Housing Tax Credit monitoring after a prepayment in full of the Loan, the Borrower shall be required to pay to HDC an amount equal to the present value (based on the Daily Treasury Yield Curve Rates, as published by the U.S. Department of the Treasury) of the annual Low Income Housing Tax Credit Monitoring Fee (as set forth in Section 6(E) hereof) at the time of the prepayment, calculated to the end of the tax credit compliance period. After making such payment, the Borrower shall no longer be responsible for the Low-Income Housing Tax Credit Monitoring Fee set forth in Paragraph 6(E) on an annual basis.

D.     The Mortgage shall require that, upon LOC Release and during the term of the Permanent Loan, Borrower make a monthly escrow payment to HDC for, among other things, real estate taxes, water and sewer charges, property and liability insurance coverage and such other insurance as may be required, so that there will be at all times, sufficient moneys on deposit to secure payment of each such item at least one month before the due date of such item.

E.      The Mortgage shall provide for a Building Reserve Fund into which payments shall be made commencing on the date of the LOC Release and thereafter on the first day of each month until the Loan, and the Subordinate Loans are paid in full. The monthly Building Reserve Fund payment amount will be adjusted annually in accordance with any increase (but not a decrease) in the New York City Consumer Price Index. The Mortgage shall also provide for a capitalized Operating Reserve (including 6 months of operating expenses, reserves and debt service). The Operating Reserve shall be deposited with HDC in full on the date of the LOC Release and shall be administered as provided in the Mortgage.

**5.      Bonds**

A.      1.      This Commitment to provide the Loan and the Additional Loan is subject to, among other things (i) the adoption of the Supplemental Resolution by the Members of HDC in their sole discretion, (ii) approval by HDC of the Borrower as set forth in Section 2 hereof, (iii) the environmental approval of the Project as set forth in Part II, Section 1 of this Commitment, (iv) the receipt and retention by HDC of a private activity tax-exempt bond allocation equal to the amount of the Allocable Bonds and sufficient not only to issue the Bonds, but also to issue bonds for its other financings, as determined by HDC in its sole and absolute discretion, (v) the approval of the issuance of the Tax-Exempt Bonds by the Mayor of The City of New York pursuant to the Tax Equity and Fiscal Responsibility Act of 1982, as amended and (vi) the approval of the Comptroller of The City of New York pursuant to the provisions of the Act (collectively, the "Approvals"). If the then required Approvals are not obtained by HDC prior to the Construction Loan Closing, then this Commitment shall be null and void and the parties shall have no other rights against each other in connection with the financing of the Project, except for the provisions of Sections 5(B), 9 and 10 hereof, which shall continue in force. Upon termination of this Commitment as above provided, HDC shall return to the Borrower, without interest, any remaining portion of the Costs of Issuance Amount (as defined in Section 6 hereof) paid by the Borrower after deduction of out-of-pocket costs and expenses and Costs of Issuance incurred in connection with the Bond Funded portions of Loan and the Additional Loan (collectively, the "Amounts").

2.      This Commitment is further subject to the sale and delivery by HDC of its Bonds under such conditions as are reasonably determined by HDC to be sufficient to make the Bond-Funded Portion of the Loan and/or the Additional Loan under the terms herein described. If HDC cannot sell and deliver its Bonds as aforesaid, HDC shall inform the Borrower of the terms and conditions upon which the Bonds may be sold so that the Borrower can determine if it desires HDC to sell the Bonds upon those terms, provided that HDC may request the Borrower to provide such additional fees, discounts, or security as HDC may deem necessary. If the Borrower declines to comply with such additional financial requirements then any remaining portion of the Costs of Issuance Amount, after application of the Amounts to HDC's out-of-pocket costs and expenses associated with

this financing and Costs of Issuance incurred, shall be returned to the Borrower, without interest; provided, however, that in the event the Amounts are not sufficient to pay such costs (the "Deficiency") the Borrower shall provide sufficient funds to make up the Deficiency. Upon return of the Amounts, as adjusted, or provision of additional funds to HDC to make up the Deficiency, the parties shall have no further rights or claims against each other in connection with the Project financing, and this Commitment shall be null and void, without further force and effect, except for the provisions of Sections 5(B), 9 and 10 hereof, which shall continue in force.

B. The Borrower understands and agrees that this Commitment, and HDC's obligation to make the Loan, the Additional Loan, the HDC Third Loan and the HDC Fourth Loan contemplated hereby, are contingent upon the issuance, sale, closing and delivery of the Bonds. The Borrower agrees that HDC, in its sole discretion, shall determine whether it will sell and issue the Bonds and the aggregate principal amount of Bonds to be issued. No liability shall attach to HDC for failure to sell or issue the Bonds or to provide sufficient Allocable Bond proceeds and/or adequate interest rates to make the Bond-Funded Portion of the Loan and/or the Additional Loan contemplated hereunder for any reason whatsoever, and the Borrower agrees not to assert any claims against HDC with regard thereto. The Borrower hereby covenants and agrees that it will indemnify, defend and hold harmless HDC and its respective present and future officers, members, employees and agents harmless from and against any and all claims or loss that HDC may suffer as a result of HDC's inability to consummate the sale of the Bonds and/or to make the Bond Funded Portion of the Loan and/or the Additional Loan contemplated under this Commitment, to the extent such claims are made by or on behalf of any person or entity having a business relationship with Borrower regarding the Project (e.g., the Borrower's agents, contractors or proposed agents or contractors).

C. The Borrower acknowledges and agrees that HDC is relying upon the Borrower's execution of this Commitment and the Borrower's intention to take the Bond Funded portion of the Loan and/or the Additional Loan committed hereunder in determining the aggregate principal amount of the Allocable Bonds and whether to sell and issue the Bonds. The Borrower further understands and agrees that, if the Construction Loan Closing occurs after the date of the issuance of the Allocable Bonds, the Borrower will be required to pay to HDC at the Construction Loan Closing the amount of the interest accruing on the Allocable Bonds from the date of issuance of the Allocable Bonds to the date of the Construction Loan Closing.

D. As a condition to the issuance of the Bonds, HDC will require the Borrower to obtain a commitment for the LOC in form and substance and from an entity satisfactory to HDC. Bank is an acceptable provider of the LOC, provided that it maintains a long-term rating of at least A from Standard & Poor's Ratings Services and a long-term and short-term rating of at least A2/P-1 from Moody's Investors Service ("Minimum Bank Rating

17

Requirement") for the term of the LOC or delivers a confirmatory letter of credit for the LOC, satisfactory to HDC, from an entity that meets the Minimum Bank Rating Requirement. In the event that the rating on the provider of the LOC or confirmatory letter of credit falls below the Minimum Bank Rating Requirement, Borrower understands and agrees that HDC will require (i) the LOC be replaced with a letter of credit substantially in the form of the LOC from an entity that meets the Minimum Bank Rating Requirement or (ii) a confirmatory letter of credit of the LOC, satisfactory to HDC, from an entity that meets the Minimum Bank Rating Requirement, to be delivered to HDC within ninety (90) days of the applicable downgrade and subject to further terms and conditions set forth in the Servicing and Release Agreement. The Borrower shall comply with all terms and conditions of any LOC provider, including any confirmatory letter of credit provider, if applicable, with regard to the LOC and the confirmatory letter of credit, if applicable.

E.   Of the Allocable Bonds, not less than $127,000,000 shall be new volume cap bonds, and shall be issued at Construction Loan Closing. The foregoing is subject, as to the future issuance of the Allocable Bonds, to the preceding provisions of this Section 5 and to compliance with the requirements of Section 1(D). If the remainder of the Bonds necessary to fund the Loan have not been issued and no event of default exists under the Loan Documents, HDC will fund such portion of the Loan on a taxable basis, up to the amount of the unfunded portion of the Loan. HDC shall use its best efforts to obtain a private activity bond volume cap allocation from the State of New York or The City of New York in the full amount required to fund the remainder of the Allocable Bonds as private activity volume cap obligations.

The term "best efforts" as used in this Commitment shall mean that HDC shall take all actions with respect to matters within its control and all reasonable actions with respect to matters beyond its control in order to accomplish the objectives set forth in this Commitment. If HDC determines that the financial cost of an action on its part with respect to matters beyond its control will be the sole reason that such action is unreasonable, HDC shall notify the Borrower and provide the Borrower with an opportunity to pay such cost, and if the Borrower pays such cost, HDC shall be required to proceed with such action. An action shall be deemed beyond the control of HDC if such action is undertaken by HDC to induce a third party that is not otherwise obligated to take a specific action. An action shall be deemed reasonable if HDC would have taken such action notwithstanding the existence of a post-Construction Loan Closing bond issuance structure for the Project.

## 6.   **Fees**

A.   1.   <u>Commitment Fee</u> – On or prior to the execution of this Commitment, the Borrower shall pay HDC a fee ("Commitment Fee") in the amount of **ONE MILLION SEVEN HUNDRED AND FIFTFTEEN THOUSAND AND 00/100 DOLLARS ($1,715,000)** by certified or official bank check or other means satisfactory to HDC. The Commitment Fee

shall be deemed earned in full by HDC upon the Borrower's acceptance of this Commitment. The Commitment Fee is non-refundable except as provided in this Commitment.

2.      Costs of Issuance Amount – On or before the date of Construction Loan Closing the Borrower shall pay HDC a fee equal to **TWO MILLION FIVE HUNDRED AND SEVENTY TWO THOUSAND FIVE HUNDRED AND 00/100 DOLLARS ($2,572,500)** for all estimated Costs of Issuance (as defined below) as determined by HDC ("Costs of Issuance Amount"). The Borrower shall pay the Costs of Issuance Amount to HDC by certified or official bank check or other means of payment acceptable to HDC.

"Costs of Issuance" means, with respect to the issuance and sale or remarketing of one or more series of Allocable Bonds, all items of expense, directly or indirectly paid or payable or reimbursed by or to HDC and related to the authorization, sale and issuance of Allocable Bonds, including but not limited to printing costs, costs of preparation and reproduction of documents, filing and recording fees, initial fees and charges of the Trustee, legal fees and charges including without limitation legal fees and expenses of Bond Counsel and counsels to the underwriter and/or purchaser of the Bonds and the Trustee, fees and disbursements of consultants and professionals including the underwriters, financial advisors or private placement agents for the Bonds (if any), costs of credit ratings, fees and charges for preparation, execution, transportation and safekeeping of Bonds, and any other cost, charge or fee in connection with the original issuance of Bonds. The Costs of Issuance Amount shall be used by HDC, in its sole discretion, to secure the payment of all Costs of Issuance incurred by HDC in connection with the issuance of the Allocable Bonds and similar costs associated with the redemption of the Allocable Bonds in the event the Loan or Additional Loan is not made. If the actual Costs of Issuance are higher than the Costs of Issuance Amount, then the Borrower shall pay the balance ("Balance") to HDC upon demand. Notwithstanding the foregoing, if, through no fault of HDC, the Construction Loan Closing does not occur prior to the expiration of this Commitment, Borrower understands and agrees that the Costs of Issuance Amount shall immediately be due and owing to HDC.

3.      Construction Financing Fee – On or before the date of Construction Loan Closing, the Borrower shall pay HDC a fee equal to **ONE MILLION SIXTY NINE THOUSAND SIXTY SEVEN AND 00/100 DOLLARS ($1,069,067)** to compensate HDC for its management of the Allocable Bonds and to reimburse HDC for certain costs incurred in connection therewith (the "Construction Financing Fee"). Notwithstanding the foregoing, if, through no fault of HDC, the Construction Loan Closing does not occur prior to the expiration of this Commitment, Borrower understands and agrees that the Construction Financing Fee shall immediately be due and owing to HDC. Furthermore, if on or before LOC Release, HDC determines that additional funds are required to compensate HDC for its management of the Allocable Bonds and to reimburse HDC for certain costs incurred

during the construction of the Project, the Borrower shall pay to HDC such amount on or before the LOC Release.

4.      In the event that the LOC Release has not occurred on or before the expiration of the Scheduled Construction Period, this Commitment may be extended at the sole discretion of HDC. In order to extend this Commitment, the Borrower may be required to deposit supplementary fees. Both the amounts and the terms of the supplementary fees shall be determined by HDC.

5.      Bond Issuance Charge – On or before the date of Construction Loan Closing, the Borrower shall pay HDC a fee equal to the amount of the Bond Issuance Charge assessed by the State of New York ("Bond Issuance Charge") in the amount of $600,250. The Borrower shall pay the Bond Issuance Charge to HDC by certified or official bank check or other means of payment acceptable to HDC.

B.     Servicing Fee – The Borrower shall pay to HDC an annual servicing fee equal to 0.25% of the outstanding principal balance of the Permanent Loan calculated on the basis of a 360 day year consisting of twelve 30 day months, payable monthly, commencing as of the effective date of the LOC Release.. If the LOC Release has not occurred on or before the expiration of the Scheduled Construction Period, and HDC has agreed to an extension of such date and/or waived a default under the Loan, the Subordinate Loans and this Commitment, then Borrower shall be required to make payments of the annual servicing fee commencing on the first day of the first month subsequent to the expiration of the Scheduled Construction Period, in an amount equal to .25% of the outstanding principal balance of the Permanent Loan and, in addition, the Borrower shall be required to continue to pay any servicing fee required by the Construction Servicer until the LOC Release occurs.

C.     Trustee Fees – The Borrower shall pay to HDC all ongoing fees, costs and expenses of the Trustee for the Allocable Bonds (the "Trustee"). The ordinary scheduled portion of the Trustee's fees shall be included in the interest rate on the Loan and the Permanent Loan. Any extraordinary or non-scheduled portion of the Trustee's fees with respect to the Allocable Bonds shall not be included in the interest rate on the Loan or the Permanent Loan and shall be paid by the Borrower to the Trustee on demand by HDC or the Trustee.

D.     Internal Revenue Service Amount – The Borrower shall pay any amount for rebate or otherwise, required to be paid to the Federal government by HDC in connection with the Allocable Bonds under provisions of the Code if such amount is not otherwise available in the accounts established under the Resolution, as well as any costs incurred by HDC in calculating such amount.

E.     Low Income Housing Tax Credit Monitoring Fee – During the compliance period for the Low Income Housing Tax Credits associated with the Project, the Borrower shall pay to

HDC an annual monitoring fee that is equal to the sum of (i) $100 for each building in the Project (the "Building Fee") and (ii) 0.75% of the maximum aggregate annual tax credit rent for the Project's Tax Code Units, subject to a cap of $12,500, if there are 150 or fewer Tax Code Units, or $17,500, if there are more than 150 Tax Code Units (the "Unit Fee", and together with the Building Fee, the "Low Income Housing Tax Credit Monitoring Fee").

F.  On-going Fees – The Borrower shall pay any on-going fees related to the Allocable Bonds and the Resolution, including without limitation, rating agency fees, HDC's bond counsel fees, and bond registration fees, if any.

G.  Supervising Engineer – The Borrower shall pay all costs and expenses incurred by HDC in connection with its retention of an architect or engineer ("Supervising Engineer") to monitor construction and completion of the Project and to deliver such certificates as may be required by HDC, forms of which are to be attached to the Servicing and Release Agreement. The Supervising Engineer selected by the Construction Servicer shall be used by HDC for the purposes of this Commitment, provided (i) such Supervising Engineer is acceptable to HDC, (ii) such engineer provides such reports as may be required of him by the Loan Documents, and (iii) HDC is entitled to rely on the reports of such engineer.

H.  Adjustments – All fees based on the amount of the Loan shall be increased proportionately in the event of any increase in the Loan or the Permanent Loan, but shall not be decreased in the event of a reduction in the Loan or the Permanent Loan.

**7.  Term of the Commitment and Extensions, Notice and Assignment**

A.  If this Commitment has not been executed and returned to HDC with the Commitment Fee, it shall expire 10 business days from the date hereof; and whether or not so returned, this Commitment shall expire if the Construction Loan Closing has not occurred by **December 31, 2026** (as such date may be extended by HDC in its sole discretion) ("Expiration Date"). This Commitment may be terminated prior to the Expiration Date in accordance with Sections 5(A) or 8 of this Commitment.

B.  At its sole discretion, HDC may extend this Commitment upon such terms as it may require, including, without limitation:

(i)  Evidence of the consent to such extension and similar extensions by the provider of the LOC.

(ii)  HDC is satisfied that the extension does not adversely affect the provisions of the Resolution or its ability to make payments and redemptions as required by the Resolution and the Bonds. In order to satisfy this requirement, HDC may require the Borrower to pay such additional fees as HDC determines are necessary in order

to ensure that there are sufficient sums, notwithstanding the extension of the Loan and the Additional Loan, to make all payments and redemptions as required by the Resolution.

(iii) The Project is in compliance with all requirements for receipt of the grant funds from HPD for the HDC Third Loan and the HDC Fourth Loan and benefits under HPD's Mandatory Inclusionary Housing Program, and all necessary approvals of HPD and of other governmental entities have been received.

C. The parties shall provide written notice to each other by mail, electronic transmission, recognized national overnight courier service or hand delivery whenever notice is required in this Commitment. HDC shall send all notices to the Borrower and/or the Guarantor to the address stated on the first page of this Commitment, or to a single different address as may be instructed by written notice from the Borrower or the Guarantor, as applicable, with courtesy copies to Katten Munchin Rosenman LLP, 50 Rockefeller Plaza, NY, NY 10020, Attention Louis Carroll, Esq., and to the Investor Member, provided, however, that failure to send any such courtesy copy, or failure of delivery thereof, shall not affect the effectiveness or timeliness of any such notice sent by HDC. Notice shall be deemed given (i) when received or receipt is refused at the above described address, if hand delivered or sent by Federal Express or other reputable courier service, (ii) three (3) business days after mailing or (iii) upon receipt of electronic transmission by the party receiving such notice, as the case may be. Notices to HDC must be addressed to the attention of its General Counsel.

D. The Borrower shall not assign this Commitment without HDC's prior written approval. Any assignment by the Borrower without HDC's prior written approval shall be null and void.

**8. <u>Termination</u>**

A. In addition to expiration of this Commitment pursuant to Section 7 above, upon the failure of the Borrower to comply with the terms of this Commitment following ten (10) business days written notice by HDC of such failure and the Borrower's failure to cure same, or in the event HDC determines that such failure cannot be cured within ten (10) business days, within such greater period of time as HDC determines, provided Borrower is making diligent efforts to cure such failure, as determined by HDC, the obligation of HDC to make the Loan, the Additional Loan, HDC Third Loan and the HDC Fourth Loan shall terminate and HDC shall send notice of same to the Borrower. In such event HDC reserves all rights it may have against the Borrower and the Guarantor hereunder or otherwise. This Commitment shall be automatically voided, with no need for further notice to the Borrower, if the LOC provider declines to provide the LOC, or the Grant Agreement is not

22

in effect at the Construction Loan Closing. In no event shall the foregoing be deemed to create any right to extend this Commitment beyond the Expiration Date.

B.　　In the event of any expiration or termination of this Commitment prior to Construction Loan Closing pursuant to Section 7(A) or 8(A), the Borrower, the HDFC and the Guarantor shall have no further rights against HDC and shall be deemed to have released HDC from any or all claims or damages in connection with the Project financing; provided, however, that the Borrower and/or the Guarantor, as applicable, shall remain liable for all advanced funds in accordance with the Loan Documents, the Additional Loan Documents, the HDC Third Loan Documents and the HDC Fourth Loan Documents, as well as for their respective obligations as set forth in Sections 5(A), 5(B), 5(C), 9 and 10 hereof all of which shall survive until satisfied.

## 9.　　**Indemnification**

A.　　The Borrower covenants and agrees, absolutely and unconditionally, at its sole cost and expense, to indemnify, defend and hold harmless HDC and each of its past, present and future Members or partners, officers, employees and agents (each individually a "Covered Party") from any and all claims, actions, suits or proceedings arising from, out of, attributable to, by reason of or resulting from HDC's issuance of this Commitment, the sale or inability to sell the Bonds, the making of the Loan and the Subordinate Loans or the holding of the notes and mortgages related thereto (collectively, the "Covered Proceedings") which Covered Proceedings arise from, out of, are attributable to, or result from any acts or omissions of the Borrower, its members or partners, and its employees or agents in connection with this Commitment, the Project, the Loan, the Subordinate Loans and the documents (including the mortgages and the notes) related thereto, and the Bonds (but excluding Covered Proceedings finally determined to have resulted from a Covered Party's own gross negligence, fraud or willful misconduct) and to pay any and all expenses, costs and charges of any kind or nature, whether foreseen or unforeseen, including, without limitation, attorneys' and experts' fees and expenses and court and discovery costs (collectively, "Legal Fees") which Legal Fees are imposed upon, incurred by or awarded against a Covered Party.

B.　　1.　　Promptly after receipt by a Covered Party of notice of the commencement of any Covered Proceeding, HDC, on behalf of itself and each Covered Party, shall, if a claim in respect thereof is to be made against the Borrower hereunder, notify the Borrower of the commencement thereof; but the omission to so notify shall not relieve the Borrower from any obligation hereunder unless such failure to so notify shall materially prejudice the Borrower's rights hereunder or the Borrower's ability or opportunity to assume the defense of any Covered Party hereunder.

2.      In the event that any Covered Proceeding is brought against any Covered Party, and such Covered Party notifies the Borrower of the commencement thereof, the Borrower shall be entitled to participate in and shall assume the defense thereof with counsel selected by the Borrower and reasonably satisfactory to such Covered Party; provided, however, the Borrower agrees that it shall not (a) settle any Covered Proceedings which are covered under this Section 9 wherein the settlement of such Covered Proceeding would contain admissions of fault, guilt or wrongdoing on the part of a Covered Party without the prior written consent of such Covered Party, or (b) except in the case of a settlement, refrain from the appeal of any decision which is adverse to any Covered Party without the consent of such Covered Party which consent shall not be unreasonably withheld or delayed.

3.      If counsel, who is representing the Covered Parties and the Borrower hereunder in defense of such Covered Proceeding, shall have concluded in good faith that a conflict of interest exists between such Covered Parties and the Borrower, and if the Covered Parties determine that the conflict is not one that can be waived, or for any other reason elect not to waive the conflict, then, so long as such conflict continues, such Covered Parties shall have the right to retain a single counsel or firm and to participate in the defense of any such action on their own behalf and all Legal Fees incurred by such Covered Parties shall be borne by the Borrower. If such single counsel shall have concluded in good faith that a conflict of interest exists between any of the Covered Parties and if the Covered Parties determine that the conflict is not one that can be waived, or for any other reason elect not to waive the conflict, then, so long as such conflict continues, each such Covered Party, with respect to which such a conflict exists, shall have the right to participate in the defense of any such action on its own behalf and all Legal Fees incurred by each such Covered Party shall be borne by the Borrower; provided that any such parties who do not have a conflict with each other shall be represented by the same counsel. Any separate counsel shall be approved by the Borrower which consent shall not be unreasonably withheld.

4.      If separate counsel are employed as described above, the Borrower and any such Covered Party agree to cooperate as may reasonably be required in order to ensure the proper and adequate defense of any Covered Proceeding, including, but not limited to, making available to each other, and their counsels and accountants, all books and records relating to such Covered Proceeding, but if any such counsel reasonably determines that the rendering of such assistance will adversely affect the defense of their client, such counsel shall not be required to comply with the terms of this sentence. Notwithstanding the foregoing, each counsel selected by a Covered Party by reason of the existence of a conflict of interest as provided above shall be permitted to participate in the defense of such Covered Proceeding provided that counsel selected by the Borrower shall be lead counsel ("Lead Counsel") with respect to such defense and shall (except to the extent of a conflict of interest) control such defense. It is the intent of the Borrower and the Covered Parties that any separate counsel representing a Covered Party shall use its reasonable

efforts to avoid duplication of legal work undertaken by Lead Counsel to reduce fees and costs which may be due hereunder. All settlements of any Covered Proceeding made in accordance with these provisions, which are consented to in writing by the Borrower, shall be paid in full by the Borrower in accordance with its consent. A party claiming status as a Covered Party shall be bound by this Section 9 by virtue of HDC's issuance of this Commitment. Before the Borrower's defense of such Covered Party shall commence, the Covered Party shall execute an agreement for the benefit of HDC to be bound by the foregoing; but failure to timely deliver such agreement shall not affect the indemnity obligations set forth in this Section 9.

C.     If the Borrower fails to pay all or any portion of any amounts, including Legal Fees, due under this Section 9 within thirty (30) days from demand of a Covered Party, the amount of such Legal Fees and all other sums payable by the Borrower to a Covered Party under this Section 9 shall bear interest from the date of demand at the prime rate of interest as reported from day to day in *The Wall Street Journal* as the base rate on corporate loans posted by a number of the nation's largest banks, plus four percent (4%) per annum, or, if such base rate is no longer available, the base rate or prime rate of interest of any "Money Center" bank designated by HDC in its sole discretion, plus four percent (4%) per annum. The Borrower hereby agrees to pay all reasonable costs, charges and expenses, including (without limitation) reasonable attorneys' fees and actual out-of-pocket expenses and including costs of collection, that may be incurred by any Covered Party in enforcing the covenants and agreements of the Borrower under this Section 9.

**10.    Guarantor**

A.     The Guarantor, absolutely and unconditionally, agrees to:

(1)     Provide the environmental guaranty under Part II, Section 1(C) hereof;

(2)     Guaranty all of the obligations of the Borrower under Part I of this Commitment set forth below (except for the Completion Guaranty referenced in Section 3(B)(3) which shall be the obligation of Lettire Construction Corp.):

(i)     Payment of the Deficiency referenced in Section 5(A)(2); payment of interest payable on the Allocable Bonds as set forth in Section 5(C); payment of the Commitment Fee referenced in Section 6(A)(1); payment of the Costs of Issuance referenced in Section 6(A)(2); payment of amounts required to pay the Construction Financing Fee referenced in Section 6(A)(3); payment of amounts required to pay the Bond Issuance Charge referenced in Section 6(A)(5); payment of the Balance referenced in Section 6(A)(2); payment of the HDC servicing fee set forth in Section 6(B); payment of the fees and expenses of the Trustee as referenced in Section 6(C); payment of the Internal Revenue Service Amount as referenced in

Section 6(D); payment of the Low Income Housing Tax Credit Monitoring Fee as referenced in Section 6(E); payment of the on-going fees referenced in Section 6(F); and payment of all costs and expenses associated with the retention of the Supervising Engineer set forth in Section 6(G).

(ii)     Fulfillment of the obligations under Sections 5(B) and 9 (Indemnification) hereof, including payment of Legal Fees, as defined therein.

B.      Guarantor acknowledges and consents to the provisions set forth in Sections 5(A)(1), 7(C) and 8, and in Part II, Sections 12, 13, 14, 15, 16, 17 and 18.

C.      The limitations on the scope of Guarantor's guaranty set forth in Section 10(A) above shall neither apply to nor limit the obligations of the Borrower under any documents executed by Borrower in favor of HDC in connection with this Commitment or the origination of the Loan and the Subordinate Loans.

**11.    Certain Conditions Precedent to LOC Release**

The LOC Release shall occur upon receipt of the documents or the fulfillment of conditions set forth in this Commitment (including the items set forth in this Section 11 as well as in Part II of this Commitment).

A.      HDC shall have received the Mandatory Prepayment pursuant to Section 3(C) hereof.

B.      The Project shall have achieved substantial completion pursuant to the Plans and Specifications approved by the Construction Servicer. Substantial completion shall not be deemed to have occurred until the date of the issuance of a permanent certificate of occupancy for the Project ("PCO") or a temporary certificate of occupancy for the Project, together with collateral security in form and amount acceptable to HDC (and REMIC, if applicable), which shall equal the sum of $50,000 (until the PCO is secured) plus an amount that is twice the cost of completion of the unfinished items at the Project as determined by the Supervising Engineer, which latter amount shall be held until completion of construction of the Project pursuant to the Plans and Specifications and written confirmation from the Supervising Engineer that all previously unfinished work has been satisfactorily completed and been delivered to HDC.

C.      The Borrower shall provide HDC with a certificate stating that the Income to Expense Ratio will be at least 1.05 to 1.00 for the twelve-month period immediately following LOC Release. In determining the Income to Expense Ratio, "Income" shall mean and include the anticipated minimum annual residential rents, community facility rents and commercial rents, if any (as evidenced by executed leases with residential and commercial tenants), and income from other sources (e.g., the operation of a laundry service, storage facility or parking, if applicable), if any, after deducting a vacancy/bad debt allowance of 5% for the

26

residential rents and 10% for any other source of Project. "Expenses" shall mean and include all of the Project's costs of maintenance and operation, debt service on the Permanent Loan and the Subordinate Loans, the payment of the required deposits into the Building Reserve Fund, and all escrows for taxes, water and sewer, assessments and insurance and similar charges. The Borrower shall further certify to HDC that the "Annual Minimum Gross Rental Achievement Level", which is Income for the 12-month period following LOC Release. In addition, the Borrower shall certify and demonstrate that the Project's Income after deduction of Expenses (but without accounting for debt service on the Permanent Loan and the Subordinate Loans) is at least equal to 115% of the scheduled annual debt service on the Permanent Loan and the Subordinate Loans (the "Debt Service Coverage Ratio"). Any master leases, including the Commercial Master Lease and the Community Facility Master Lease, entered into between the Borrower and a related entity will not be considered in calculations to determine rental achievement or compliance with HDC's conversion underwriting requirements. All leases and subleases relating to non-residential space must be approved in advance by HDC. Notwithstanding the foregoing, if the Project's Income after deduction of Expenses, as set forth in this Paragraph C, is not at least equal to the percentages set forth herein by reason of insufficient non-residential income, including but not limited to Community Facility Space and/or Retail Space Income, the Borrower may provide HDC with a letter of credit or a cash deposit, in an amount and on terms acceptable to HDC in its sole discretion, in the Shortfall Amount (as hereafter defined). The "Shortfall Amount" shall be the amount of the reduction of the principal amount of the Permanent Loan that would be required to achieve a minimum 115% Debt Service Coverage Ratio and 1.05 to 1.00 Income to Expense Ratio on the Permanent Loan and the Subordinate Loans, computed in accordance with this paragraph and based on the then applicable Income and Expense amounts for the Project. If a letter of credit or cash deposit in the Shortfall Amount is utilized as permitted herein, the required Annual Minimum Gross Rental Achievement Level shall be deemed decreased proportionately, solely for purposes of the LOC Release, to the amount of rent required for a Permanent Loan as reduced by the Shortfall Amount. If the Borrower does not achieve the required Annual Minimum Gross Rental Achievement Level within the stated term of the letter of credit or cash deposit agreement provided to cover the Shortfall Amount, as such term may be extended at HDC's sole discretion, such letter of credit or cash deposit may be applied, at HDC's sole discretion, to fund an escrow or to pay down the amount of the Permanent Loan as permitted by the Loan Documents.

D.    The Borrower shall provide HDC with:

(1)    A certificate, satisfactory to HDC, from either the Borrower's architect or engineer, stating that (i) the Project has been constructed substantially in accordance with the Plans and Specifications and is free from defects in materials and workmanship and (ii) the construction of the Project and the intended operation of the Project are in

27

substantial compliance with the applicable zoning, environmental, ecological, landmark and all other applicable laws, ordinances, rules, regulations, restrictions and governmental requirements, including unit accessibility and adaptability for the disabled; and

(2)     The Final Article XI and evidence of the ICAP abatement, or, alternatively, an escrow holdback with respect to the ICAP abatement in an amount reasonably determined by HDC;

(3)     The RAC in connection with the rental assistance pursuant to the NYC 15/15 Rental Assistance Program in an amount not less than $1,035,780 per year; and

(4)     The NYC 15/15 Award contract in connection with subsidy assistance.

E.     The Borrower shall have received the full proceeds from the HDC Third Loan and HDC Fourth Loan to the extent required to be funded during construction, provided however, that if any funds not provided by HPD are provided in full from Borrower equity or another source acceptable to HDC, in its sole discretion, this requirement shall be deemed satisfied.

F.     Notwithstanding whether such approvals have been given at an earlier date in connection with the Construction Loan Closing or otherwise, HDC shall have approved, in its sole discretion, (i) the managing agent of the Project and (ii) the management contract with respect to the Project, and (iii) HDC shall have received a fully executed management contract satisfactory to HDC in its sole discretion.

G.     The Condominium Documents shall have been approved by HDC and HPD and the Condominium shall have been formed (subject to the requirements of this Commitment).

## 12.   REMIC Insurance

HDC, in its sole discretion, may seek to obtain mortgage insurance for the Permanent Loan from REMIC, effective on the date of the LOC Release. In such event, the Permanent Loan would be the subject of a Commitment to Insure and Certificate of Insurance from REMIC (the "Mortgage Insurance Commitment") naming HDC as the insured. The Borrower shall cooperate fully with HDC if HDC seeks to obtain the Mortgage Insurance Commitment and, if obtained, the Borrower shall comply with all terms and conditions of the Mortgage Insurance Commitment, whose terms and conditions shall be incorporated herein by reference.

## 13.   Counterparts

To facilitate execution, this Commitment may be executed in counterparts. It shall not be necessary that the signature of or on behalf of any party appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Commitment to produce or account for more than a single counterpart containing the respective

signatures of, or on behalf of each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto, except having attached it to additional signature pages. Delivery of any signature page may be accomplished by facsimile or electronic transmission, provided that the hard copy original signature page is delivered with reasonable promptness thereafter, and the facsimile copy shall be deemed an executed original counterpart of the Commitment.

## 14.    Survival

The obligations of the parties under this Commitment shall not terminate upon the making of the Loan, the Additional Loan, the HDC Third Loan or the HDC Fourth Loan by HDC but shall survive until all obligations under this Commitment are satisfied in their entirety.

## 15.    Compliance with HireNYC

Mortgagor shall and shall cause the general contractor and all applicable subcontractors to, comply with the requirements of HireNYC as more particularly set forth in the HireNYC Rider and made a part hereof, as may be modified by the City of New York from time to time.

## 16.    Utility Benchmarking

Upon the issuance of a temporary certificate of occupancy for any space in the Project by the City's Department of Buildings, the Borrower shall contract, at the Borrower's expense, with a qualified benchmarking software provider on the HDC-approved list (the "Qualified Software Provider") to collect monthly and annual data on the heating, electric and water usage at the Premises (the "Utility Performance Information") in accordance with HPD's building benchmarking protocol. Not later than May 1 of each year during the Occupancy Restriction Period, the Qualified Software Provider retained by the Borrower shall input the Utility Performance Information for the immediately preceding year into the U.S. Environmental Protection Agency's ENERGY STAR Portfolio Manager system, or such other system as may be designated by HDC and HPD ("Portfolio Manager"). The Borrower agrees and acknowledges that (i) the Utility Performance Information will be made available to HDC and HPD through an account located on Portfolio Manager, and (ii) HDC and HPD may receive the Utility Performance Information directly from the Qualified Software Provider. HDC and HPD reserve the right to require the Borrower to replace the Qualified Software Provider if the provider is no longer on the HDC-approved list. During the Occupancy Restriction Period, the Borrower shall at all times abide by the requirements of this section and the HPD building benchmarking protocol, as may be amended. Throughout the restriction period of the Regulatory Agreement, the Borrower shall at all times abide by the terms and conditions set forth in this Paragraph 16 and in the HPD Benchmarking Protocol, as may be amended from time to time. For the avoidance of doubt, the Borrower's engagement of a utility benchmarking service for the Project shall not be a condition for the LOC Release.

17. **Local Law 44 Compliance; Reporting Requirements**

The Project is subject to the requirements of §§26-901 – 26-905 (Chapter 10 of Title 26) of the Administrative Code of the City of New York. Pursuant to such law, HPD must make the information listed on the attached Schedule A ("Required Information") available on its website. Borrower shall provide HPD with the Required Information for the Project in the form to be provided by HPD and submit it to HPD on the date of closing and again with new and updated Required Information (i) on every January 30 and July 30 thereafter (commencing on whichever date is the first to occur after closing) until completion of construction and (ii) on the date of the closing of the Permanent Loan. Borrower shall also comply, and shall cause its contractors and subcontractors to comply, with the wage reporting information requirements set forth in §26-904 and shall submit such wage reporting information to HPD in such form and in such manner as directed by HPD.

18. **Payment of Fees**

The Borrower must pay, to HPD, at Construction Loan Closing a certified check made payable to the New York City Department of Finance for payment of an Equal Employment Compliance Fee of $1,400 and the Borrower shall pay all other fees as indicated in the approved budget attached to the Servicing and Release Agreement.

19. **M/WBEs**

Borrower shall comply with the provisions of the M/WBE Rider attached hereto and made a part hereof.

20. **Subcontractor Enhanced Review**

Borrower shall ensure that the following language concerning the retention of subcontractors is included in the construction contract (the "Construction Contract") between Borrower and Lettire Construction Corp. (the "Contractor"), entered into in connection with the Project. Borrower shall ensure that the Contractor complies with the following requirements. If the Contractor does not comply with such requirements, Borrower and its principals may be subject to negative scoring during future requests for proposals, requests for qualifications, or other selection processes, and adverse findings during Sponsor Review.

> "Prior to hiring any subcontractor that HPD has placed on Enhanced Review status under the Enhanced Contractor Review Procedure as of the date hereof (the "Enhanced Review List"), or allowing such a subcontractor ("Enhanced Review Contractor") to perform any work on the Project, Contractor must obtain written consent from HPD in accordance with the requirements of the Enhanced Contractor Review Procedure, available on HPD's website, to engage such Enhanced Review Contractor. If HPD consents to Contractor's request to engage an Enhanced Review Contractor,

30

HPD will monitor the Enhanced Review Contractor's work on the Project. Contractor acknowledges that if Contractor engages an Enhanced Review Contractor that is on the Enhanced Review List without obtaining the prior written consent of HPD, the Contractor will be placed on Enhanced Review status."

### 21. Prevailing Wages for Building Service Employees

The Project is located within a City-initiated rezoning area. All building service employees shall be paid no less than a prevailing wage, as set forth in NYC Administrative Code Section 6-130, for the term that the Project receives "financial assistance" (as defined in NYC Administrative Code Section 6-130(a)(10)).

### 22. Brownfield Cleanup Program

If the Project receives Additional Equity (as defined in Section 23(A)) in connection with the New York State Brownfield Cleanup Program (the "BCP"), then Borrower shall use such Additional Equity to offset any negative tax credit adjusters and then shall use 50% of any remaining Additional Equity to prepay the outstanding principal balance of the HDC Fourth Loan until it is fully repaid, then the HDC Third Loan until it is fully repaid, and then the Additional Loan until it is fully repaid, subject to the consent of the Bank.

A. "Additional Equity" shall mean any cash received in connection with the BCP and the Project by the Borrower, any member or principal of the Borrower at any tier, or any related party, less the initial BCP equity amount of $9,749,025 required to be funded pursuant to the final budget for the Project that has been approved by HDC.

B. Any and all payments required to be made pursuant to this Section 23 must be made; (1) within 30 days of receipt of Additional Equity or (2) if Additional Equity is received prior to the date of the Permanent Loan Closing, then following and within 30 days from the date of the Permanent Loan Closing. No payment required under this provision shall be a condition to the Permanent Conversion.

C. The Guarantor absolutely and unconditionally agrees to guarantee the payment of any Additional Equity required to be paid to HDC.

### 23. Zoning Lot Merger and ZLDA

At Construction Loan Closing, the Borrower shall have executed and delivered the zoning lot declaration and related exhibits and a zoning lot development agreement, acceptable to HDC and HPD, with respect to the zoning lot merger of the Premises and the adjoining sites.

### 24. Bankruptcy Court

The proposed sale and transfer of the Property as provided above, together with confirmation of a plan of reorganization providing for the same to the Borrower free and clear of al claims, liens and interests is and remains subject to Bankruptcy Court approval pursuant to an Order which becomes final and fully effective.  You are authorized to prepare and file a proposed plan of reorganization consistent with the terms hereof.

*[Signatures follow]*

Please signify your acceptance of the terms and conditions of this Commitment by executing and returning one original of this Commitment.

Very truly yours,

**URBAN BUILDERS COLLARBOATIVE LLC**

By: _____
Matthew Gross
Authorized Signatory

Accepted and Agreed to:

By: _____
Name:
Title: